UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                              Bankruptcy No. 05-32145
                                                    Chapter 7
Robert Frederick Woodrow,

        Debtor.
_____/

First State Bank of Munich, North Dakota,

        Plaintiff,

    vs.                                           Adversary No. 05-7060

Robert Frederick Woodrow,

        Defendant.
_____/

**MEMORANDUM AND ORDER**

By Complaint filed December 28, 2005, Plaintiff First State Bank of Munich ("the bank") initiated this adversary proceeding seeking a determination that an outstanding debt owed by Debtor/Defendant Robert F. Woodrow to the bank on two loans in the total amount of $233,514.92 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2) and (6). Debtor filed an Answer on January 30, 2006, denying the allegations. The matter was tried on April 27, 2006. The following constitutes the Court's findings of facts and conclusions of law.

I. Findings of Fact

Debtor is 26 years old and started his own farming operation in 2002. Farm Service Administration (FSA) extended operating loans to Debtor in 2002 and 2003. In 2003, Debtor also had machinery loans and a small loan for custom harvesting from the bank in 2003. In the fall of 2003, the bank loaned Debtor money to help him make his cash rent down payment.

Although FSA had provided Debtor operating loans in the two years prior, in 2004 the operating loan he sought was too large for FSA, so Debtor approached the bank. Debtor testified that he met with Bryan Anderson, a bank loan officer, to "put the numbers together." Because Debtor lacked collateral and had a tight cash flow, the bank was willing to lend to Debtor only if FSA would guarantee the bank's 2004 operating loan. FSA requires prior direct credit to be paid off in full before it guarantees loans, and Debtor owed FSA approximately $65,000 from his 2003 operating loan.

The bank hired an independent contractor to prepare the documentation for the FSA guarantee which covered both the 2004 operating loan and a refinanced $161,000 equipment loan. He prepared the loan documents including a "Farm and Home Plan" (hereafter "farm plan") using information provided by Debtor. The farm plan includes a balance sheet with asset values, liabilities, and net worth, and also includes a cash flow analysis for 2004. On February 10, 2004, Debtor, Anderson and the independent contractor met and went through the loan documents, and Debtor signed the farm plan.

Debtor's 2004 operating loan from the bank was $250,000, and of that amount, approximately $65,000 was used to pay off Debtor's 2003 FSA debt. Anderson testified that the bank anticipated that the sale of Debtor's 2003 crop inventory would be sufficient to cover the amount owed on the FSA debt because Debtor's farm plan showed crop inventory valued at $69,160.[1] Anderson testified that he knew Debtor had worked on a shared basis with his uncle in prior years, but the farm plan did not provide any indication that Debtor's ownership interest in the

---

[1] The farm plan indicated Debtor had $40,480 of wheat, $20,770 of barley, and $7,910 of canola.

2

crop inventory was partial. Debtor informed the bank only after it made the loans that his uncle had a one-half ownership interest in the crop inventory. When asked at trial why he did not reveal his uncle's interest when the loan documents were being prepared and reviewed, Debtor testified that he did not think to mention his uncle's one-half interest.

Debtor's farm plan also contained inaccuracies as to prepaid cash rent. The farm plan lists $34,000 of prepaid cash rent, but only $10,000 had actually been prepaid. Debtor testified that as of the date he signed the farm plan, he had written checks for cash rent totaling $34,000, but the checks had not yet been cashed. He explained that he wrote several checks for cash rent before his loan was approved because he had expected the money to be there from FSA. He gave the landowners the checks and asked them to hold the checks until funds were available. Debtor testified he talked to Anderson about the fact that the operating loan would be providing the funds to cover the checks, and Debtor contended that Anderson knew the checks would be cashed March 15, 2005, and April 1, 2005. Debtor testified he did not understand that his representation on the farm plan was inaccurate. Moreover, Debtor testified he was surprised to find that the prepaid cash rent was an issue because the trial in this case was the first time he had heard anything about it. After the loans were approved, the bank allowed the cash rent checks to go through because, Debtor suggested, the bank knew that cash rent was due and that Debtor's problem had been getting the money to pay it. Anderson, on the other hand, insisted the bank was aware that Debtor had made a $10,000 partial down payment on cash rent but did not have any basis for knowing about the other $24,000.

Anderson testified that the bank relied on the farm plan in making the loans to Debtor and would not have extended credit to Debtor if the inaccuracies in the farm plan had been known. The

3

true value of Debtor's inventory would have resulted in a negative cash flow, Debtor would have been short of covering the direct loan from FSA, FSA would not have guaranteed the loans, and the bank would not have made the loans without the guarantee. Moreover, if the farm plan had accurately listed prepaid cash rent at $10,000 rather than $34,000, Debtor would have had a reduction of equity and cash flow. The farm plan indicated a $23,000 positive cash flow, so if the correct amount of prepaid cash rent had been included, Debtor would have had a $1,000 negative cash flow. Anderson testified that any discrepancy in Debtor's application would have impacted the repayability of the loans, and Debtor's application would not have been approved.

The loans and the guarantee were approved, however, in February 2004. The operating loan was set up on a draw account, and Anderson said that Debtor came into the bank to make draws and saw Anderson or another bank officer.

Anderson testified that the Debtor did not comply with the terms of the FSA loan guarantee. The guarantee application states that $241,500 of the $250,000 operating loan was to be used for farm operations and $8,500 was to be used for family living expenses, but Debtor used more than $8,500 for family living expenses. Debtor said it was for labor on the farm, but Anderson disputed this because Debtor did not include hired labor expenses on his 2004 tax return under his farm expenses.

Debtor explained that he needed hired labor in excess of $8,500 because his original operating plan involved planting various crops in 2004, and that plan fell apart because of wet conditions. He testified that he came up with an alternative plan to put the acreage into summer fallow. Debtor was unable to get into the fields because of the wet conditions, and grass grew to a foot high on his 1500 acres of land. Debtor said he had to act fast, and he could not do all the work

himself because the parcels of land he farmed were 60 miles apart. He needed to hire labor, and Debtor testified he told the bank he was doing so. The bank approved, and Debtor employed eight people and spent $33,000 on labor. Of that amount, Debtor reimbursed his mother $6,050 for buying supplies, parts, fuel and meals. Debtor testified he did not include hired labor in his farm plan because it was not contemplated prior to the unexpectedly wet planting season.

Debtor acknowledged that he did not list the labor expenses on his 2004 tax return. He explained that he was advised to show a positive cash flow on his tax return so he could pay social security taxes or else the Internal Revenue Service would ask questions.[2] If he had listed the farm labor on his tax return, he would have had too many expenses to have a positive showing. Also, Debtor was applying for a loan to buy a home with help from Anderson, and to get the loan, he had to have a positive cash flow. Debtor testified that Anderson told him to make sure to get the house because $5,000 was taken out of his operating loan to use as a down payment on the house. Debtor had 30 days to get financing for the house or he would forfeit the $5,000. In short, Debtor did not list his labor expenses because he did not want his taxes to show a negative cash flow in order to get the loan for the house and to make sure he got social security.

Anderson testified Debtor also violated a provision in the promissory notes he signed for both the operating loan and the equipment refinancing loan that specifies: "CAPITAL PURCHASES SHALL BE LIMITED TO $5,000.00 UNLESS PRIOR APPROVAL BY THE BANK IS OBTAINED. THE PROVISION SHALL APPLY NOT ONLY TO ADVANCES ON THIS NOTE BUT TO OUTSIDE FINANCING INCLUDING DEALER CONTRACTS." Anderson testified that

---

[2] Debtor testified that Paulette Paulson was the individual who advised him not to show a loss on his taxes. No evidence was offered to identify Paulson's professional capacity, if any.

5

Debtor made equipment purchases of more than $5,000 without prior approval including a tractor, chisel plow, disk, harrow, v-plow, and pickup truck.

Debtor testified he was unaware of the provision until after he had purchased the equipment. He said he did not read the loan documents because Anderson put the papers in front of him and said, "Sign this." Debtor said he simply signed where he was told to sign. Anderson, however, testified that he never advises customers not to read documents before signing.

Notwithstanding his alleged ignorance of the provision, Debtor testified that he did indeed get prior approval for the purchase of the tractor, disk and harrow. Debtor testified that in each instance he talked to Anderson prior to the purchase, they looked in the account and saw adequate funds, and Anderson approved the purchases. Incongruously, Anderson testified that if Debtor had asked the bank about purchasing a tractor, the bank would not have given its approval. Regardless whether the purchases were approved, the bank honored Debtor's checks.[3] Anderson explained that the bank does not monitor checks as they come through, but he conceded that FSA requires the bank to make sure funds are dispersed according to the loan agreement.

Before Debtor filed for bankruptcy, his equipment was auctioned, and the bank received the auction proceeds to apply toward Debtor's indebtedness on the equipment loan. Anderson said some of Debtor's 2004 capital purchases were sold at auction, but other equipment was not accounted for, including a grain cart, port-a-pit, and tractor. Debtor testified he sold the grain cart for $5,800 to offset the purchase of the harrow, and the bank knew it was sold. Debtor put the grain cart proceeds into his checking account, which was ultimately used to reduce his indebtedness. Debtor explained

---

[3] E.g., on June 30, 2004, Debtor wrote a check to Anderson, Sales Inc. for $18,000. The memo line of the check states, "Tractor Down." On August 24, 2004, Debtor wrote check to Langdon Implement for $11,110.

6

that he did not write a check to the bank for $5,800 after the sale of the grain cart because a payment was not due at the time. The port-a-pit was sold for $2,800 and the proceeds were handled like those from the grain cart. The tractor was not sold at auction, but its present disposition is unclear from the evidence.

Debtor filed for relief under Chapter 7 of the Bankruptcy Code on September 23, 2005. Debtor's indebtedness to the Bank on October 17, 2005, after application of the equipment sales proceeds was $233,514.92.[4] Anderson testified that after applying FSA's 90% contribution under the guarantee, Debtor's outstanding obligation to the bank on the two loans is $74,179.73.

## II. Conclusions of Law

The statutory exceptions to discharge in bankruptcy are narrowly construed to effectuate the fresh start policy of the Bankruptcy Code. Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir. 2002). Accordingly, a creditor opposing discharge of a debt must prove the debt falls within an exception to discharge. Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993). The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is the preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991) Simek v. Erdman (In re Erdman), 236 B.R. 904, 910 (Bankr. D.N.D. 1999). Where an objecting plaintiff fails to establish every element of the section 523(a)(2)(A) action under this standard, the indebtedness at issue is dischargeable. Id.

A.    Section 523(a)(2): False Pretenses, False Representation or Actual Fraud

Section 523(a)(2) of the Bankruptcy Code provides that a discharge does not discharge an individual debtor from any debt:

---

[4] This total reflects $149,480.97 owing on the operating loan and $84,033.95 owing on the equipment loan.

7

> (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2). The bank argues that both 523(a)(2)(A) and (B) provide a basis for nondischargeability.

    1.    Section 523(a)(2)(A)

The bank first argues that Debtor's outstanding obligation is nondischargeable because Debtor obtained his loans from the bank by false pretenses, a false representation or actual fraud through the unauthorized use of operating loan proceeds. The language "obtained by" in section 523(a)(2) clearly requires that the fraudulent conduct occurred at the inception of the debt, i.e., the debtor committed a fraudulent act to induce the creditor to part with its money, property or services. Valley Memorial Homes v. Hrabik (In re Hrabik), 330 B.R. 765, 772 (Bankr. D.N.D. 2005). The bank therefore must make a threshold showing that the alleged fraud existed at the time of, and has been the methodology by which, the money, property or services were obtained. Id. Misrepresentations made subsequent to the creation of the debt have no effect upon the dischargeability of a debt, since the false representation could not have been the creditor's reason for the extension of credit. Id. (quotation omitted).

The Court acknowledges the inconsistencies in the testimony of Anderson and Debtor as to whether Debtor obtained approval for purchases and expenses, but even if the Court takes Anderson's testimony as true it does not support a claim under section 523(a)(2)(A). Debtor's alleged fraudulent use of his operating loan funds did not – and could not – exist during the loan application and approval process. His alleged fraudulent use did not induce the bank to extend credit to him, and it was not the methodology by which he obtained the loans. Because the bank failed to meet this threshold requirement, the bank's claim under section 523(a)(2)(A) on this basis fails.

The bank also asserts that Debtor's outstanding obligation is nondischargeable under section 523(a)(2)(A) because Debtor disposed of bank collateral without authorization and failed to apply the proceeds to the debt owed to the bank.

The bank's claim on this basis likewise fails to meet the threshold requirement that the operating loan was obtained through the fraudulent conduct. Debtor's alleged unauthorized sales of equipment did not induce the bank to extend credit to him, and any misrepresentation subsequent to the creation of the debt does not affect dischargeability. See In re Hrabik, 330 B.R. at 772.

2.      Section 523(a)(2)(B)

The bank argues that Debtor obtained his loans by intentionally deceiving the bank as to his financial condition as represented in his farm plan.

To prevail under section 523(a)(2)(B), the bank must establish that Debtor obtained money from it 1) by the use of a statement in writing that was materially false; 2) that pertained to his financial condition; 3) on which the bank reasonably relied; and 4) that Debtors made the statement

9

with the intent to deceive the bank.  See 11 U.S.C. § 523(a)(2)(B); Jacobus v. Binns (In re Binns), 328 B.R. 126, 130 (B.A.P. 8th Cir. 2005).

The statements at issue here are Debtor's representations in his farm plan that he owned all of his crop inventory and that he had prepaid $34,000 of cash rent.  These statement pertained to his financial condition and satisfy the second element of section 523(a)(2)(B).  The remaining issues are whether the written statement was materially false, whether the bank reasonably relied on the statements in granting the loans to Debtor, and whether Debtor made the statements with intent to deceive the bank.

      a.      Material falsity

The first element requires that the statement be written and materially false.  There is no question that Debtor's statements in his farm plan were written.  The concept of "materiality" within the context of section 523(a)(2)(B) includes objective and subjective components.  Fairfax State Sav. Bank v. McCleary (In re McCleary), 284 B.R. 876, 885 (Bankr. N.D. Iowa 2002); Ramsey Nat'l Bank & Trust Co. v. Dammen (In re Dammen), 167 B.R. 545, 550-51 (Bankr. D.N.D. 1994).  Objectively, a statement is materially false if it paints a substantially untruthful picture of a debtor's financial condition by misrepresenting information of the type that would normally affect the decision to grant credit.  Wallander v. Wallander (In re Wallander), 324 B.R. 746, 752 (Bankr. N.D. Iowa 2005).  The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation.  In re Dammen, 167 B.R. at 51.

Subjectively, Anderson testified that the bank would not have made the loans to Debtor if either of the inaccuracies in the farm plan had been known because any discrepancy would have

10

affected repayability of the loans.  The true value of Debtor's crop inventory would have resulted in a negative cash flow, Debtor would have been short of covering the direct loan from FSA, FSA would not have guaranteed the loans, and the bank would not have made the loans without the guarantee.  An accurate representation as to prepaid cash rent of $10,000 rather than $34,000 would have likewise reduced Debtor's equity and cash flow.  The farm plan indicated a $23,000 positive cash flow, so if the correct amount of prepaid cash rent had been included, Debtor would have had a $1,000 negative cash flow.

The Court is also convinced that Debtor's misrepresentations painted a substantially untruthful picture of his financial condition from an objective standpoint.  He represented to the bank that he had sufficient assets for his operation to cash flow and for adequate equity to secure the bank's position, and those representations were false.

        b.     Reasonable Reliance

The next issue is whether the bank reasonably relied on Debtor's false representations.  To establish reasonable reliance, a creditor must prove that reliance was objectively reasonable and that there was actual reliance.  In re Bowden, 326 B.R. 62 (Bankr. E.D. Va. 2005).  Reasonable reliance is determined considering the totality of the circumstances.  First Nat'l Bank of Olathe v. Pontow, 111 F.3d 604, 610 (8th Cir. 1997); Guess v. Keim (In re Keim), 236 B.R. 400, 402 (B.A.P. 8th Cir. 1999).

Anderson testified that he did indeed rely on Debtor's false representations as to crop inventory and prepaid cash rents, so the bank therefore established actual reliance.  The issue is whether the bank's reliance was objectively reasonable.

11

Among other things, a court may consider whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate, and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations. Pontow, 111 F.3d at 610. The issue of reasonableness presented under section 523(a)(2)(B) is not whether it was reasonable for the bank to have loaned Debtor the money, but whether it was reasonable for the bank to have relied upon his statements in making those loans. A creditor is not required to assume that a debtor is lying or misrepresenting facts in a financial statement, but the standard of reasonableness places a measure of responsibility on a creditor to ensure that there exists some basis for relying on a debtor's representations. See NAFCO Fed. Credit Union v. Lawson (In re Lawson), 308 B.R. 417, 424 (Bankr. D. Neb. 2004).

Applying the totality of the circumstances test, the court finds that the bank's reliance on Debtor's representations was reasonable. Although Anderson knew Debtor had worked on a shared basis with his uncle in prior years, this knowledge alone was not a "red flag" that Debtor's representation as to his crop inventory from the prior growing season might include the Debtor's uncle's share. As to the prepaid cash rents, Debtor alleged Anderson knew that the operating loan would provide the funds to cover the checks, but Anderson insisted the bank was only aware that Debtor had made a $10,000 partial down payment but did not have any basis for knowing about the other $24,000. The bank's reliance on Debtor's representation that he had prepaid $34,000 of cash rent was also reasonable.

      c.      Intent to Deceive

For discharge to be barred, the debtor must have acted with intent to deceive. A creditor may establish such intent by proving reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement. In re Lawson, 308 B.R. at 423.

The record in this case supports a finding of recklessness or actual intent to deceive. Debtor's meager explanation that he did not think to mention his uncle's one-half interest exemplifies his reckless disregard for the accuracy of the representations in his farm plan. His explanation is wholly inadequate and unpersuasive. Likewise, the Court finds Debtor's claim that he did not understand that he misrepresented prepaid cash rents to be disingenuous. The Court concludes the bank proved Debtor had the requisite intent to deceive, and Debtor's outstanding obligation to the bank is therefore nondischargeable under section 523(a)(2)(B).

B.      Section 523(a)(6): Willful and Malicious Injury

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The terms "willful" and "malicious" are two distinct elements, and each must be shown to establish an exception to discharge. Osborne v. Stage (In re Stage), 321 B.R. 486, 492 (B.A.P. 8th Cir. 2005).

The term willful means deliberate or intentional. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Hobson Mould Works, Inc. v. Madsen (In re Madsen), 195 F.3d 988, 989 (8th Cir. 1999). The injury, and not merely the act leading to the injury, must be deliberate or intentional. Geiger, 523 U.S. at 61- 62. Malice requires conduct which is targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial injury. Madsen, 195 F.3d at 989.

13

Malice requires conduct more culpable than that which is in reckless disregard of the creditor's economic interests and expectancies. Ehrman v. Feist (In re Feist), 225 B.R. 450, 454 (Bankr. D.N.D. 1998). A debtor acts with malice by intending or fully expecting to harm the economic interests of the creditor. Id. The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent additional aggravating circumstances. Johnson v. Logue (In re Logue), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003). It is the intent to cause harm to the creditor which must exist for an injury to be malicious. Stage, 321 B.R. at 493.

The bank argues that Debtor's cumulative conduct demonstrates Debtor willfully and maliciously injured the bank. Specifically, the bank cites Debtor's unauthorized disposition of equipment, misrepresentations on the farm plan, labor expenses, and equipment purchases in violation of the terms of the loan. Debtor explained the disposition of the grain cart and port-a-pit. Although the proceeds of the sale were put into his checking account which ultimately was applied against his indebtedness on the operating loan rather then the indebtedness on his equipment loan, the Debtor's conduct was not certain to cause the bank harm. As for the tractor, the bank failed to establish its disposition. Debtor also adequately explained his need for labor expenses. Moreover, even though they were in excess of the $8,500 the guarantee earmarked for personal expenses, they were not personal expenses. Next, the Court does not condone the Debtor's conduct in falsifying his tax return but does accept his reasons for doing so as self-motivated rather than malicious. Lastly, there is no evidence that Debtor's equipment purchases, albeit in violation of the terms of the loans, were made with the intention of injuring the bank. In sum, the bank failed to prove Debtor willfully or maliciously injured it. The bank's claim under section 523(a)(6) fails.

14

Based on the foregoing, the outstanding obligation owed by Debtor/Defendant Robert F. Woodrow to Plaintiff First State Bank of Munich in the amount of $74,179.73 is nondischargeable under 11 U.S.C. § 523(a)(2)(B).

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this May 26, 2006

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**